C. W. TERRELL, Appellant, v. AUGUST WICHT and FRED E. WICHT, Appellees.

**Real property:** EVIDENCE AS TO ITS CHARACTER: COMPETENCY. A party who had no personal knowledge that a tract of land inspected by him was the tract in controversy, but simply stated that it was pointed out to him by a third party as such tract, was not qualified to testify to the character of the land as being the identical land in controversy, and in an action involving fraudulent representations as to its character.

*Appeal from Polk District Court.*—HON. W. H. McHENRY, Judge.

TUESDAY, DECEMBER 15, 1914.

ACTION on a promissory note. Opinion states the facts. —*Reversed.*

*J. G. Myerly,* for appellant.

*Chas. W. Johnston* and *A. P. Chamberlain,* for appellees.

GAYNOR, J.—The plaintiff's cause of action is based on a promissory note for $100, dated May 17, 1902, bearing 8 per cent. interest, executed by these defendants and delivered to the plaintiff.

The defendants answer, admitting the execution and delivery of the note, but say that the note was procured through misrepresentation and fraud on the part of the plaintiff; that the note was given to the plaintiff for commission claimed to be earned by the plaintiff as a real estate agent in the exchange of some Des Moines property, in which the defendants had an interest, for certain real estate situated in Keya Paha county,

Neb. Defendants say that plaintiff represented that the land in Nebraska was valuable, and suitable for all kinds of crops, well improved in every respect, good rich soil, and free from incumbrance; that it had a dwelling house, barn, outhouses, and sheds, whereas the land was sandy and poor—in fact, worthless—which the plaintiff well knew, with back taxes and incumbrances all of which the plaintiff knew, but concealed from the defendants; that the defendants had never seen the land, and relied upon plaintiff's statements, and signed the note and parted with their equity in the Des Moines property because of the fraud of the plaintiff.

Upon the issues thus tendered, the cause was tried to a jury, and a verdict returned for the defendants, and, judgment having been entered thereon, plaintiff appeals.

Defendant August Wicht, testifying for himself, says:

I listed the property with Terrell, the plaintiff. Terrell said that he had a man to trade for the house. My property was valued at $4,000. The Nebraska land was one hundred and sixty acres. The plaintiff said the land was fenced and had an old house, an old barn, and he knew it personally. He said it was good black soil—a good farm. He said he could sell the land in about six months. My sister had $400 in the property we traded. Ed. Bragdon was her husband. I afterwards deeded this land to Bragdon. On my property there was a mortgage of $1,500, and another of $800. The man that owned this land came to see me first. He said he was sent by the plaintiff. Plaintiff said he had been on the place himself and thought it a good deal. He did not say when he had been on the place. I said I would make the trade. He said nothing about any being broken out. The owner gave me a description of the land, the same as plaintiff did. He told me of the buildings—the old house and barn.

George Bragdon, called for the plaintiff, said:

I went to Nebraska to look at this land, and got a description of the land at the recorder's office. They found me a man there that knew the land. I made a personal inspection as to the character of the soil and the nature of the land.

He was then asked the question: "Describe what you found." To this question the plaintiff objected, on the ground that the witness had not shown himself qualified. He has not shown that the land he examined was the land which the defendants traded for, or that he knew the land in any way; just stated he found a party who told him he knew the land, that such testimony was incompetent, and the witness has not shown himself competent to testify. This objection was overruled, and then he answered:

It was sandy and blowing at the time. I could not see any difference in the land there. I walked over it pretty thoroughly. We drove and walked over it. Had some corn about three feet high. Was there in September or October. There was only a small piece broken out. The rest consisted of buffalo grass and a little bunch grass. No improvements of any kind. It was not fenced, I did not think this was good land. Edwin Bragdon employed me to go and see the land.

On cross-examination he said:

All I know about whether this land was the land in controversy was what this man told me. He told me that was the land; that is all I know about it.

Thereupon plaintiff moved to strike out his testimony, on the grounds heretofore stated, and this was overruled.

This was all the testimony offered by the defendant in support of his contention that the note was obtained by fraudulent representations made by the plaintiff, touching the character of the land in Nebraska involved in the trade.

Plaintiff, in rebuttal, called J. P. Hewitt, who testified:

The defendants' property in Des Moines, at the time it was traded for the land in Nebraska, was not worth upon the market more than $2,500.

Enos B. Hunt, called for the plaintiff, testified that its market value was from $2,250 to $2,500.

G. C. Terrell, the owner of the land in Nebraska that was involved in the trade testified:

The property in Des Moines was encumbered for $2,500, and I took back a mortgage on the Nebraska land for $500 on the trade. The Nebraska land was clear. The soil on this Nebraska land is rich clay loam—good soil. I don't think there is any excessive sand in the soil. When I saw it, it had a good crop on the cultivated portion, while there was a number of stacks of hay on the raw land. The land grows wheat, corn, oats, and hay. The crops grown in this land will compare favorably with crops grown on any other land in that county, and its productive quality compares favorably with any other land I have seen in that state.

John Howell, testifying for the plaintiff in rebuttal, said:

I live in Keya Paha county, Neb. I have lived near this land for three years, and in Nebraska forty-two years. I am acquainted with the land in controversy. I bought the land in 1909, and have helped the renter plow corn on the land. There were seventy acres under cultivation when I bought it. The land is generally what I would call a black sandy loam, and this is uniform all over the place, except on the west side, where there are eight or nine acres of pretty sandy land, but it raised good corn in the year 1912. Outside of about ten acres in the west eighty, the balance is first-class producing land.

John M. Coble, for the plaintiff, testified:

I know this land in question, and have known it for twenty-seven years. The soil is black sandy loam, pretty much the same all over the land, and is productive for any kind of crops that I have seen grow thereon. I do not think there is much sand in the soil to hurt it. It is better than the average land in the county. The best in that locality. There is not to exceed ten acres on the west side that is too sandy to make good farm land. I have seen good crops grow there, and the unbroken land has been used to cut hay from, and it turns off a lot of hay.

Ezra H. Tisue testified:

I am acquainted with the land in controversy. Have known it twenty-eight years and passed it frequently. The soil is generally a black sandy loam, with the exception of a few acres on the west side. I would say it was first-class farm land. I find the black sandy loam a good producing soil, but I do not consider that class of land as good as the heavy clay land for producing crops.

The defendants took the deposition of Pearl Wicker, which was introduced by the plaintiff in rebuttal:

I know the land in controversy. Farmed it for seven years. It has now sixty-five acres under cultivation. The south forty is good black loam. The northeast forty is somewhat gravelly, and the west eighty has some sand and gravel, but I find it raised good crops. Have seen corn, rye, and oats growing on this land various years. All that is really too sandy to farm is about twenty acres, but the rest is very good land. There were no improvements on the land in 1902. Only twelve acres under cultivation. The corn I raised on the land would average twenty bushels to the acre one year with another.

This is all the evidence offered by either party. Upon this evidence, the jury returned a verdict for the defendants.

This case seems to have been tried upon the theory that, if there were any representations made, such as charged by the defendants in the answer, touching the character of this land in Nebraska, which are shown to be false, and the plaintiff knew them to be false, and the defendants relied upon them as true, and were induced thereby to give the note, the plaintiff cannot recover.

In their answer the defendants claim, among other things, that the plaintiff represented to them, at the time, that there was a dwelling house, barn, and outhouses on this property. They claimed that the plaintiff represented to them that he had been on the place, and that he spoke from personal knowledge. There is evidence tending to show that plaintiff repre-

sented that he had been on the place, and that there was a house and barn on it. The plaintiff, however, in his testimony denies that he was ever on the place; denies that he ever told them that he had been on the place, or that he knew of his own knowledge the character of the land or its improvements; and denies that he ever told them or any one that there was a house and barn on the land. There is a conflict in the evidence upon these points. There is no conflict in the evidence as to the character of the land itself, unless we permit the testimony of George Bragdon to stand as having probative force upon this controverted question. His testimony was objected to, and the objection overruled. His testimony was that he had no personal knowledge of the land; that he went out to Nebraska at the instance of one Edwin Bragdon to look at the land in question. He does not know personally whether he examined this land or not. All he knows is that some man told him that he knew the land, and some man told him that the land he inspected was the land in controversy. He said:

All I know about the land I inspected as to its being the land in controversy is what this man told me about it.

It does not appear that this man knew where the land in controversy was, except from what he said. With this foundation, he was permitted to testify as to the character of the land he looked at, the character of the land he examined, and his testimony relates only to the land which he examined, but there is no competent evidence that the land he examined is the land in controversy. It is the merest hearsay, and the court should have sustained the objection to his testimony, and for this error, the case must be reversed.

It would be a dangerous doctrine to permit one to testify as to the character of anything in controversy, based upon an inspection of the thing, without first showing that the thing inspected was the thing in controversy. It would open the door to fraud. It would render great uncertainty in the administration of the law to permit such testimony to have pro-

bative force upon the issue. The danger of this rule could be exemplified in many ways. A question might arise as to whether or not a party made certain statements prejudicial to his own interest. A witness who was not at all acquainted with the party should be called to testify to those statements, and it should be made to appear that he had no acquaintance with the party, and did not know whether he had ever seen the party whose statements he purported to give, except that some one had told him that the party with whom he conversed was the party whose statements were involved in the suit. Surely that would not be sufficient to lay a foundation to bind the party charged with those statements.

Suppose a controversy should arise as to whether a sidewalk was defective at a point where plaintiff claimed to have been injured, and one should be called to testify as to the character of the sidewalk at that point, and it should appear that the only knowledge he had of the place where the plaintiff was injured was that some stranger pointed out a place to him and said to him that that was the place where the plaintiff was injured. Would any court permit him to state the character and condition of the walk, at the place thus examined, as a basis for damages against the city for injuries received from a defective sidewalk? We think not. As bearing upon this question, see *Wells Fargo Co. v. Waites* (Tex. Civ. App.), 60 S. W. 582; *State v. Houghton*, 43 Or. 125 (71 Pac. 982); *Arthur v. Arthur*, 38 Kan. 691 (17 Pac. 187); and *Long v. Ringemann*, 145 Ala. 678 (40 South. 81).

For the error pointed out, we think the case must be— *Reversed.*

LADD, C. J., and DEEMER and WITHROW, JJ., concurring.